IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

THE LOS ALAMOS STUDY GROUP,

     Plaintiff,

    v.                              Case No. _____

UNITED STATES DEPARTMENT OF
ENERGY; THE HONORABLE STEPHEN
CHU, in his capacity as SECRETARY,
DEPARTMENT OF ENERGY;
NATIONAL NUCLEAR SECURITY
ADMINISTRATION; THE HONORABLE
THOMAS PAUL D'AGOSTINO, in his
capacity as ADMINISTRATOR,
NATIONAL NUCLEAR SECURITY
ADMINISTRATION,

     Defendants.

**COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF UNDER THE NATIONAL
<u>ENVIRONMENTAL POLICY ACT OF 1969</u>**

I.

<u>PRELIMINARY STATEMENT</u>

1.    This action arises under the National Environmental Policy Act of 1969, as

amended (NEPA), 42 U.S.C.A. §§ 4321 *et seq.*, together with the implementing regulations for

NEPA issued by the White House Council on Environmental Quality ("the CEQ Regulations")

40 C.F.R. §§ 1500-08, and regulations issued by the Department of Energy ("DOE"), 10 C.F.R.

§ 1021.  This action also arises under the Administrative Procedure Act, 5 U.S.C.A. §§ 701 *et*

*seq.*

2.     This action challenges defendants' actions in planning, approving, and implementing the construction and operation of the proposed Chemistry and Metallurgy Research Replacement Nuclear Facility ("Nuclear Facility") at the Los Alamos National Laboratory ("LANL") in Los Alamos, New Mexico. The proposed Nuclear Facility would be an approximately four billion dollar facility for storing and handling plutonium. Construction is currently expected to begin in 2011 and conclude in 2020.

3.     The complaint seeks a declaratory judgment and mandatory injunction requiring defendants to comply with the National Environmental Policy Act of 1969 (NEPA), by preparing an environmental impact statement (EIS) regarding the proposed Nuclear Facility and its many subprojects. The complaint also seeks an injunction to prohibit all further investment in the Nuclear Facility, including all detailed design, construction, and obligation of funds, until an EIS is prepared.

4.     Defendants prepared an EIS under the NEPA in 2003 for a much simpler and less environmentally impactful nuclear facility concept. Subsequently, defendants greatly expanded the scale, scope, cost, and geographic footprint of the proposed Nuclear Facility, while adding numerous additional buildings and project elements that were not part of the original proposal. The Nuclear Facility has expanded so greatly that defendants, at the request of the Senate Armed Services Committee and other authorities, are now conducting studies regarding the proposed size, scope, and cost of the Nuclear Facility and alternative means of constructing it. Defendants have never prepared an EIS analyzing the environmental impacts of the aggrandized Nuclear Facility now proposed and its alternatives. NEPA requires them to do so.

II.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C.A. § 1331 (federal question), and 28 U.S.C.A. § 1361 (mandamus); and 28 U.S.C.A. § 1651 (writs); and may issue a declaratory judgment and a preliminary and permanent injunction and further relief pursuant to 5 U.S.C.A. §§ 701 *et. seq.* (Administrative Procedure Act), 28 U.S.C.A. § 2201 (declaratory relief) and 28 U.S.C.A. § 2202 (injunctive relief). There is a present and actual controversy between the parties. Venue is properly vested in this Court pursuant to 28 U.S.C.A. § 1341(e) and the Rules of Procedure for the United States District Court for the District of New Mexico.

III.

## PARTIES

6.     Plaintiff the Los Alamos Study Group ("the Study Group") is a non-profit corporation organized under the laws of the State of New Mexico, which focuses on educating the general public, federal and contractor management, members of Congress, and others on a range of inter-related policy issues, including Department of Energy ("DOE") missions, programs, and infrastructure. The Study Group has approximately 2,691 members and supporters within a 50-mile radius of LANL, approximately 2,341 of whom live within a 30-mile radius of LANL. The Study Group and many of its members have been intimately involved in the analyses and education regarding LANL plutonium infrastructure and programs since October 1989. Given their proximity to LANL and the proposed Nuclear Facility, the Study Group members are adversely affected and will be irreparably harmed and aggrieved by the environmental impacts of

3

planning, constructing, and operating the proposed Nuclear Facility. Additionally, the Study Group and its members have no adequate remedy at law and must seek equitable relief to prevent the environmental consequences of defendants' continuing efforts to plan, construct and operate the proposed Nuclear Facility without preparing an applicable EIS, which is preceded by a meaningful scoping process.

7.   The Study Group and its members have commented to the National Nuclear Security Administration ("NNSA") and to its predecessor, DOE Defense Programs ("DP"), regarding the matters raised in this Complaint on previous occasions over the last two decades. The Study Group commented on the scope of the now antiquated EIS and discussed the Nuclear Facility issues with NNSA officials on numerous occasions. Study Group representatives have traveled dozens of times to Washington, DC to meet with NNSA and other executive branch officials, as well as with members of Congress, their staff, and with congressional research, auditing, and oversight organizations regarding issues raised in this Complaint. To the limit of the Study Group's resources and abilities, and within the limits of the information available to the Study Group and to its members, the Study Group has carefully followed and engaged with the federal government on CMRR issues. The Study Group has diligently pursued and exhausted all of the administrative remedies available to it - and many more - over a decade-long period specifically concerning the proposed Nuclear Facility.

8.   Defendant DOE is an executive branch department with jurisdiction and authority over LANL. DOE has a duty to comply with NEPA at its facilities, including LANL, where the proposed Nuclear Facility would be built.

4

9.     Defendant the Honorable Stephen Chu is the Secretary of the Department of Energy and is named as a defendant in his official capacity.

10.    Defendant NNSA is the agency within the DOE with direct jurisdiction and authority over all aspects of the proposed construction and operation of the Nuclear Facility, including NEPA compliance.

11.    Defendant the Honorable Thomas Paul D'Agostino is the Administrator of the NNSA and is named as a defendant in his official capacity.

IV.

FACTUAL BACKGROUND

12.    Defendants' Chemistry and Metallurgy Research Replacement (CMRR) project would complete two new buildings at LANL's Technical Area 55 (TA-55), to be devoted primarily to activities involving plutonium.   These two buildings are: (A) a Radiological Laboratory, Utility, and Office building (RLUOB); and (B) the proposed Nuclear Facility.

13.    RLUOB contains laboratories designed to handle small quantities of radioactive materials, including approximately a few grams of weapons-grade plutonium.   The proposed Nuclear Facility, however, is being designed to store, handle, and process several tons of plutonium.   Both new facilities would augment the capabilities of, and would be directly or indirectly connected to, LANL's main Plutonium Facility, Building PF-4.   PF-4 is being thoroughly upgraded in a separate, but connected, major project.

14.    The RLUOB structure is physically complete and is being outfitted.   RLUOB is expected to be ready for full occupancy and use in approximately 2013.

5

15.    Defendants have reported that they expect to begin initial construction on the proposed Nuclear Facility project in the coming fiscal year (FY2011).   Defendants have requested $225 million for the CMRR project from Congress for FY2011, including $168.5 million for the proposed Nuclear Facility, an increase of $110.3 million from the present fiscal year (FY2010), more than tripling the present appropriation.   Congress has taken no final action on this request.

16.    Other than the interstate highway system, the proposed Nuclear Facility is by far the largest proposed federal or state capital project in the history of New Mexico.   The Nuclear Facility is expected to cost in the neighborhood of $4 billion to build, roughly ten times as much as RLUOB, currently estimated at $363 million. By comparison, inflation-corrected costs for three of the state's largest previous public construction projects, Elephant Butte Dam, Cochiti Dam, and the "Big I" highway interchange project in Albuquerque, are approximately $222 million, $344 million, and $386 million, respectively.   Of all government-funded projects undertaken in New Mexico, only the interstate highway system is of comparable cost.

17.    At Los Alamos, estimated Nuclear Facility costs are comparable to the inflation-corrected costs of building and operating the whole laboratory for its first decade (1943-1952), including constructing all of the facilities and conducting all the activities of the Manhattan Project, and constructing the post-war Chemistry and Metallurgy Research (CMR) building and all other early post-war projects and facilities.

18.    The primary purpose of the proposed Nuclear Facility is to facilitate an increase in the capacity of the TA-55 facilities to manufacture plutonium warhead cores, known as "pits." Several other projects underway and proposed are also part of this manufacturing upgrade, but

the proposed Nuclear Facility dwarfs all these other projects in cost, duration (approximately two decades from start to finish), and complexity.

19.     The CMRR project was first announced in 1999 and was provided with conceptual planning funds by 2000.  It was first funded by Congress as a formal engineering and design project in 2002 and first funded as a construction line item in 2003.  Despite line item appropriations of more than $289 million (roughly 7-8% of the estimated total cost) since 2002, the Nuclear Facility has never fully progressed through defendants' "preliminary design" stage.

20.     NNSA has never prepared what it calls a "performance baseline" for the Nuclear Facility, which is a detailed scope of work, key project performance parameters, a reliable cost estimate, and an accepted completion schedule.  Defendants have not made what they call "Critical Decision 2" or "Critical Decision 3," which formally allow detailed design and construction, respectively, and Congress has never authorized or appropriated funds for the actual construction of the proposed Nuclear Facility.

21.     On July 23, 2002, NNSA filed a Notice of Intent (NOI) to prepare an EIS for the CMRR project.  An EIS was issued on November 14, 2003 ("2003 EIS").  A Record of Decision (ROD) was issued on February 12, 2004 ("2004 ROD," 69 Fed. Reg. 69, pp. 6967-6972).

22.     In the 2003 EIS, all of the alternatives analyzed, except the "No Action" alternative, appeared superficially similar.  Each alternative included constructing facilities of the same type and size, in slightly different ways, at somewhat different maximum depths (50 ft vs. 75 ft.), at one of two adjacent technical areas at LANL.  The 2003 EIS reported that the "above-ground" concept (i.e. less than 50 ft. deep) was the upper bound for impacts.  The EIS did not mention the adverse engineering properties of the approximately 50-foot-thick layer of poorly-

7

consolidated volcanic ash beneath the site, beginning at an approximate depth of 75 feet. These adverse properties are now known to generate extensive additional project requirements and greatly expanded environmental impacts for what defendants called "below ground" construction options – those which approached 75 feet in depth.

23.     In the ROD, NNSA chose its preferred alternative, which included "above-ground" construction that would not exceed 50 feet in depth.

24.     In 2002, the total cost provided to Congress by defendants for both CMRR buildings was "$350-500" million, not including administrative costs. In 2003, defendants provided to Congress a total cost for both buildings of "$600 million," including administrative costs. Since these initial years, projected costs for the Nuclear Facility have increased by approximately a factor of ten to roughly $4 billion. In the 2003 EIS, defendants reported that the high cost of certain alternatives was a significant factor in rejecting them from NEPA analysis. Those "high" costs are now only a small fraction of the expected cost of the Nuclear Facility.

25.     In early 2003, when defendants were eliminating possible alternatives from NEPA analysis, defendants reported to Congress that both buildings would be completed by the end of calendar year 2010. In their 2003 EIS, defendants assumed that construction would be completed even earlier, by the end of 2009. Presently, however, defendants do not expect to complete the proposed Nuclear Facility before 2020 and do not expect to begin operating it until 2022, which is a delay of approximately one decade from the original estimate. Defendants must now choose and implement interim actions to maintain or increase safety for the programs remaining in the CMR building, actions which were not mentioned, discussed, or analyzed in the

8

2003 EIS. These federal actions are in effect new unplanned components of the expanding Nuclear Facility project.

26.     In 2003, when defendants were eliminating possible alternatives from NEPA analysis, the proposed Nuclear Facility was to consist of 60,000 square feet of floor area for handling large amounts of plutonium (DOE "Hazard Category 2" space) in an approximately 200,000 gross square foot building. The currently-proposed Nuclear Facility would provide about 36% less Hazard Category 2 space in about a 44% larger building, measured by floor area, leaving only 14% of the proposed floor area available for program use, which is about half the fraction available in 2003. In the several years that have passed since defendants vetted project alternatives prior to the now-antiquated NEPA analysis, projected unit costs per useful square foot have risen even farther and faster than projected overall Nuclear Facility costs, thereby widening the potential range of reasonable alternatives to the proposed Nuclear Facility.

27.     In May 2003, and again in October 2004, defendants increased the Design Basis Threat (DBT), which is the hypothetical threat standard against which they must be able to defend all their nuclear facilities. These new DBT requirements disadvantaged the less-impactful "above ground" (less than 50 feet deep) construction plan, which was chosen in the 2004 ROD. For this reason and others, defendants abandoned "above ground" construction, as selected in the 2004 ROD, and substituted a design which includes excavation up to 75 feet in depth. Defendants chose this new design without providing public, agency, or tribal notice, without providing comment opportunities, and without any record of decision whatsoever.

28.     This significant design change, in combination with the geology of the site and its constrained size, access, topography, and its existing heavy uses, profoundly transformed the

project and dramatically increased expected costs and environmental impacts across LANL and the region.  However, it subsequently proved impossible even to build the facility at 75 feet in depth, without complete replacement or reengineering of the earth to a depth of 125 feet, a far more challenging concept at this site and one that was not mentioned or analyzed in the 2003 EIS and certainly not in the 2004 ROD.

29.     On January 5, 2005 NNSA announced its intent to prepare a Supplement to the 1999 LANL Site-Wide EIS (SWEIS) and held one scoping hearing later that month.  Completion and operation of the proposed Nuclear Facility was incorporated into all proposed alternatives, including the "No Action" alternative.  Without further public notice NNSA later decided to prepare a new SWEIS instead of a Supplement to the SWEIS.  A final SWEIS was published on April 4, 2008 (2008 SWEIS).

30.     The 2008 SWEIS considered three alternative generic levels for all of LANL operations.  Construction and operation of the original Nuclear Facility concept proposed in the 2003 EIS was part of the "No Action" and "Expanded Operations" alternatives.  The 2008 SWEIS imported by reference the assumptions and findings of the 2003 EIS, and those assumptions and findings were not changed or updated.  The 2008 SWEIS did not describe or analyze the Nuclear Facility proposed today.

31.     On September 26, 2008, the first SWEIS ROD was issued, combining portions of the "No Action" and "Expanded Operations" alternatives, both of which included construction and operation of the original concept for the Nuclear Facility proposed in 2003. Defendants acknowledged, however, that "[n]ew information about seismic risks at LANL . . . may change how . . .facilities are constructed or renovated."

32.     On October 19, 2006, NNSA announced its Notice of Intent (NOI) to prepare another broad and generic EIS, which was labeled a "Supplement to the Stockpile Stewardship and Management Programmatic Environmental Impact Statement," and subsequently renamed the Complex Transformation Supplemental Programmatic Environmental Impact Statement (CTSPEIS). The final CTSPEIS was published on October 24, 2008.

33.     The CTSPEIS included the original Nuclear Facility concept proposed in 2003 as an element within larger possible program choices.  The CTSPEIS neither mentioned any changes in the nature of the proposed Nuclear Facility, nor did it analyze the proposed Nuclear Facility's environmental impacts in any way.  Defendants responded, in response to public comment, that "[n]o [building] footprint additions [to the Nuclear Facility] are planned beyond that [footprint] already analyzed within the CMRR EIS [ the 2003 EIS]; therefore, because there will be no change to what has already been analyzed, no further facility NEPA analysis is planned."

34.     On December 19, 2008, NNSA issued two RODs pursuant to the CTSPEIS.  The first CTSPEIS ROD included a decision to proceed with design, construction, and operation of a Nuclear Facility at LANL, citing the analyses in the 2003 EIS, the 2008 LANL SWEIS, as well as those in the CTSPEIS.  The latter two analyses merely incorporated the 2003 EIS and did not update it in any way.  None of these NEPA analyses addressed the Nuclear Facility as it is proposed today.

35.     In November 2006, the JASON defense advisory group, at the request of Congress, articulated a new scientific consensus that most plutonium pits have credible lifetimes in excess of 100 years and therefore will not need replacement within the proposed Nuclear

11

Facility's useful life. This consensus, developed three years after the 2003 EIS, dramatically increased the viability of reasonable alternatives to the Nuclear Facility and obviated the fundamental purpose of building the Nuclear Facility in the first place.

36. In May 2007, defendants published an updated probabilistic seismic hazard assessment (PSHA) for LANL, which "significantly revised" defendants' understanding of the regional fault system. The overall seismic hazard to LANL and to the proposed Nuclear Facility, including both the magnitude and frequency of expected earthquakes, "increased significantly" from that reported in the 2003 EIS. Predicted accelerations doubled for the 10,000-year recurrence interval earthquake. The probability of an earthquake in the range of magnitude 7 in a given year increased by a factor of roughly 25. Earthquakes up to magnitude 7.3 are now believed possible. This new information has had far-reaching consequences for the nature of the proposed Nuclear Facility project and its expected environmental impacts, particularly given the adverse engineering properties of the earth beneath the proposed facility.

37. Defendants are presently designing the currently-proposed Nuclear Facility under a so-called "hotel concept," the purpose of which is to accommodate unstated future missions. This concept requires wide unsupported floor and roof spans, with relatively few internal walls, and thus has raised significant design and safety concerns. Upon information and belief, the "hotel concept" has contributed to the dramatic (roughly 20-fold) increase in expected structural concrete and steel requirements since the 2003 EIS, thereby significantly increasing the environmental impacts of construction. The "hotel concept," and possible reasonable alternatives to it, were never mentioned, discussed, or analyzed in the 2003 EIS.

38.     In May 2008, the Defense Nuclear Facilities Safety Board (DNFSB) formally transmitted to defendants their serious concerns about the adequacy of Nuclear Facility design with respect to seismic and other safety issues.  The FY2009 Defense Authorization Act (P.L. 110-417) subsequently withheld approximately half of the authorized FY2009 CMRR funding until DNFSB and NNSA could jointly certify that the serious issues raised by DNFSB had been resolved.

39.     In May 2009, the Obama Administration presented its first budget request to Congress, formally ending the Reliable Replacement Warhead (RRW) program, the pits for which were to be manufactured at LANL's TA-55, with storage, testing, processing, and/or other plutonium handling activities occurring in the proposed Nuclear Facility.  This was the only large-scale pit production mission ever formally planned for TA-55, and no further such mission has been authorized or planned since.  At that time, defendants acknowledged to Congress:

> It is recognized that many of the prior [CMRR project] planning assumptions have changed.....The decision about how far to proceed into final design [of the proposed Nuclear Facility] will be based on numerous ongoing technical reviews and other ancillary decisions NNSA management will be making during the period of FY 2009 - 2010. A future decision to proceed with construction of the Nuclear Facility and associated equipment has been deferred pending the outcome of the current ongoing Nuclear Posture Review and other strategic decision making.

40.     Despite defendants' acknowledgments concerning the changed planning assumptions, and despite congressional testimony in the spring of 2009 suggesting the proposed Nuclear Facility project might be too large or might be entirely unnecessary, defendants chose not to initiate any NEPA analysis of the changed Nuclear Facility.

41.    In July and August of 2009, the serious design issues raised by DNFSB were resolved and their resolution was formally transmitted by DNFSB to Congress.  This resolution included, among several other agreed design changes, intensive remediation or replacement of the 50-foot thick stratum of unconsolidated volcanic ash beneath the proposed Nuclear Facility. This substantial change in the proposed Nuclear Facility was deemed necessary to prevent structural collapse and/or lateral sliding of the proposed Nuclear Facility in the event of a large earthquake.

42.    In September 2009, the JASON advisory group reported to NNSA that the stockpile could be maintained indefinitely at current standards of reliability, safety, and security, without new pit production.  Defendants then submitted a budget request to Congress which would conclude all active stockpile pit production at the end of FY2011.  In April 2010, consistent with this budget request, the DOD and defendants established a policy of giving "strong preference" to stockpile management without pit manufacturing, which would be allowed only, "if critical... goals could not otherwise be met, and [only] if specifically authorized by the President and approved by Congress."

43.    In February 2010, defendant NNSA commissioned a review of the proposed Nuclear Facility project, including a review of "key planning assumptions" and "the magnitude of their impacts" on cost and management risk.

44.    In May 2010, the Senate Armed Services Committee issued its markup of the FY2011 Defense Authorization bill, saying the proposed Nuclear Facility project had "*many* unresolved issues *including the appropriate size of the facility*" (emphasis added).   The Committee went on to say:

> Now that the Nuclear Posture Review is completed *the NNSA and the Department of Defense (DOD) are in a better position to ensure that the facility is appropriately sized....*The committee is very concerned that the NNSA follow the DOE 413 order series and project management and guidance. The NNSA is also directed to conduct a true independent cost estimate for the CMRR Nuclear Facility, phase III of the CMRR project. The committee is concerned that the phase III project [i.e. the Nuclear Facility] is being divided into multiple sub-projects. Notwithstanding this management approach the committee directs the CMRR baseline to reflect all phases and subprojects for the purposes of the cost and schedule baseline provision and to be accounted for as a single project (emphasis added).

45.     On June 16, 2010, defendants held a public meeting and revealed a web site describing the extensive planned construction (and, *inter alia*, environmental impacts) associated with what defendants called the "Pajarito Construction Corridor," in which the Nuclear Facility would be the largest proposed project.  Some of these direct environmental impacts, connected actions, and cumulative impacts had never been mentioned by defendants before.  Defendants also mentioned they were conducting internal studies of these heretofore unrevealed project alternatives and impacts, including utilities planning, traffic studies, site selection for ancillary facilities needed for the proposed project, and institutional impacts of the proposed project.

46.     On July 6, 2010, the Comptroller General of the United States wrote defendant DOE, expressing his agency's urgent concern, given defendants' ambitious construction proposals, that defendant DOE "does not have a sound basis for making decisions on how to most effectively manage its portfolio of projects."

47.     On July 15, 2010 LANL Director Anastasio testified to Congress that:

[t]here is already a gap emerging between expectations and fiscal realities. I fear that some may perceive that the FY11 budget request meets all of the necessary budget commitments for the program; however, there are still significant financial uncertainties, for example, the design of the UPF [the proposed Uranium

15

Processing Facility in Tennessee] and CMRR are not complete and the final costs remain uncertain. As I look to the future, I remain concerned that science will be squeezed when trying to compete with capital infrastructure investments and life extension program funding priorities.

48.　On July 20, 2010, defendant D'Agostino told the *Nuclear Weapons and Materials Monitor* that other fundamental reviews of the Nuclear Facility are planned besides the one(s) recently completed and underway, "including one by the Department of Defense," which will reexamine the proposed Nuclear Facility's "requirements" and "scope," asking, among other things: "Is it out of bounds?"

49.　On July 27, 2010, former NNSA Deputy Administrator John Foster testified to Congress, requesting "a thorough scrub" of proposed Nuclear Facility requirements and suggesting that escalating costs at the proposed Nuclear Facility and another proposed facility could have "major" negative impacts on defendants' other national security programs:

> In addition, budgets are estimated for new facilities, in particular CMRR at Los Alamos for research on plutonium and UPF, a uranium parts manufacturing plant at Oakridge in Tennessee. The Committee should understand that at present we do not yet have good cost estimates for the new facilities, each of which are expected to cost billions of dollars. There is general concern that their costs will exceed the preliminary estimates and that may force major reductions in other NNSA nuclear weapons activities to include warhead surveillance, the life extensions and science programs....I have suggested that the Nuclear Weapons Council initiate a thorough scrub of the necessary capabilities and construction costs for the new facilities to insure that safety, security, programmatic risks and costs are effectively managed.

50.　As a result of the significant new circumstances and information that have changed the proposed Nuclear Facility project so dramatically over the past eight years, the expected environmental impacts of the proposed facility have also increased significantly relative to the 2003 EIS. Examples include:

16

A.     Increased  overall  *acreage  requirements  for  construction  yards  and  offices*, parking lots, concrete batch plant, utilities, security infrastructure, excavation spoil disposal, storm water retention basin(s) temporary housing, and road realignments or bypasses.

B.     The *locations directly affected* by construction have greatly expanded.  The 2003 EIS anticipated direct construction impacts in TA-55 only, for construction limited to that location.  NNSA now expects direct construction impacts in TA-55, TA-48, TA-63, TA-66, TA-46 and TA-50, and TA-54 or TA-36.

C.     *Concrete and soil grout requirements* have greatly increased, from 6,255 yd$^3$ (for two or three buildings in the 2003 EIS) to 347,000 yd$^3$ of structural concrete and soil grout for the Nuclear Facility alone, a factor of more than 55.

D.     The manufacture of the additional concrete has significant additional *greenhouse gas emissions*, which were not mentioned or analyzed in the 2003 EIS at all.  Upon information and belief, production and delivery of concrete and grout alone for the proposed Nuclear Facility may now produce more than 100,000 metric tons of carbon dioxide, more than four times CEQ's proposed source threshold for EIS analysis and at least 55 times the emissions from this source in the original project.

E.     The  manufacture  of  this  much  additional  concrete  will  result  in  significant *aggregate mining impacts*, which were not analyzed in the original EIS.

F.     *Steel requirements* have greatly increased, from an estimated 558 tons (for two or three CMRR buildings in the 2003 EIS) to more than 15,000 tons for the Nuclear Facility today, a factor of more than 27.

G.     *Expected peak employment* during proposed Nuclear Facility construction has increased, according to NNSA, from an estimated 300 in the 2003 EIS to an estimated 844 today. According to NNSA, this increment in transient workforce could affect local housing markets, possibly requiring temporary worker housing.

H.     The anticipated *construction period* during which these construction impacts will occur has been lengthened from 34 months in the 2003 EIS to 144 months today, more than a factor of four.

I.     Increasing  the  depth  of  excavation  from  50  feet  to  125  feet  has  increased  the *excavation spoils to be disposed* from roughly 100,000 cubic yards to roughly 400,000 cubic yards, not including material already removed from the proposed Nuclear Facility site during RLUOB construction.  Transport, storage, disposal, and reclamation of this waste will have significant environmental, aesthetic, and cultural impacts.  Prompt permitting is not assured.

J.     According to NNSA, defendants expect to use a major part of these *excavation spoils to cap hazardous chemical and nuclear material disposal areas* (MDAs), specifically

17

MDAs C and G, in lieu of other closure options for those sites, including whole or partial removal of waste. According to defendants, MDAs C and G contain roughly 14 million cubic feet of diverse nuclear and chemical wastes, including transuranic wastes. Decisions to: (a) leave these wastes in place; and (b) cover these sites with volcanic ash removed from the proposed Nuclear Facility excavation, were not mentioned or analyzed in the 2003 EIS. The decision to leave 14 million cubic feet of nuclear and chemical waste in shallow unlined disposal pits covered by this material would be a major federal action significantly affecting the quality of the human environment, with far-reaching impacts.

K.     The proposed Nuclear Facility will not begin operations until 2022. The 2003 EIS assumed this would occur more than a decade sooner. The proposed Nuclear Facility project therefore now also includes *continued CMR operation for a decade longer* than described in the 2003 EIS, or, in the alternative, *compensatory interim actions*. By implication the Nuclear Facility project now includes, for at least the coming decade, elements of both the Preferred and the No Action alternatives of the 2003 EIS.

L.     Construction of the proposed Nuclear Facility now requires construction of a *craft worker facility*, which was not part of the project analyzed in the 2003 EIS.

M.     The proposed Nuclear Facility construction now requires an *electrical substation*, which was not part of the project analyzed in the 2003 EIS.

N.     The proposed Nuclear Facility construction now requires traffic modifications, including *closure of Pajarito Road for two years* and *possible construction of temporary traffic bypass(es)*. These impacts and actions were not analyzed in the 2003 EIS.

O.     The proposed Nuclear Facility construction now requires construction of a *truck inspection facility*, which was not part of the project analyzed in the 2003 EIS.

P.     The proposed Nuclear Facility construction now requires construction of a *warehouse*, which was not part of the project analyzed in the 2003 EIS.

Q.     Some of the 4,400 employees whose workplaces are accessed from Pajarito Road will be temporarily displaced during work on the proposed Nuclear Facility. Upon information and belief, this requires *temporary facilities for those "Pajarito Corridor" operations which may be displaced by construction*, which were not part of the project analyzed in the 2003 EIS.

R.     The proposed Nuclear Facility is now expected to contain roughly 29 times as much structural concrete as shown in the 2003 EIS. *Final disposition of the proposed Nuclear Facility*, which would become contaminated during use with plutonium and other toxic substances, was not analyzed in the 2003 EIS and, upon information and belief, *is made much more problematic and expensive by the far greater volumes of building materials now expected* to be used in the building.

S.     The new Nuclear Facility will *dramatically increase trucking of concrete ingredients and excavation spoils*, which were not analyzed in the 2003 EIS.  Between 20,000 to 110,000 heavy truck trips to and from Los Alamos County, and within LANL, would be required for concrete ingredients and for storage and disposal of excavation spoils alone, not including all other deliveries and services.  Trucking impacts will extend to at least three and to as many as five counties, depending on secondary project alternatives, sources, routes, and quantities.

51.     The impacts summarized above will be exacerbated by the cumulative impacts of other construction activities planned in and on the same canyon and mesa or close nearby, at more or less the same time, which were not included in the 2003 EIS.

## CLAIMS FOR RELIEF

### Count I

**Violation of NEPA  and APA – Failure to Prepare
an Applicable EIS for the Proposed Nuclear Facility and Failure
to Implement Alternative Chosen in any Record of Decision.**

52.     Plaintiff incorporates the allegations in paragraphs 1 through 51 the same as if fully set forth.

53.     Defendants' decision to construct and operate the Nuclear Facility comprises a major federal action "significantly affecting the quality of the human environment" within the meaning of 42 U.S.C.A. §  4332(2)(C), 40 CFR 1508.3, 40 CFR 1508.14, 40 CFR 1508.18, and 40 CFR 1508.27.

54.     Pursuant to 42 U.S.C.A. § 4332(2)(C) and the implementing CEQ regulations, defendants must prepare an applicable EIS "before decisions are made and before actions are taken," and "at the earliest possible time." 40 CFR 1500.1, 1501.2.  Defendants are prohibited from taking any action that has an adverse environmental impact, limits reasonable alternatives to the proposed action, or prejudices agency decisions in the absence of an applicable EIS and subsequent final decision (40 CFR 1502.2(f), 40 CFR 1506.1).

55.    Notwithstanding these statutory and regulatory directives, Defendants are implementing a Nuclear Facility proposal which differs substantially from, and has significantly much greater environmental impacts than, any alternative analyzed in the 2003 EIS or in any subsequent EIS. In short, the 2003 EIS is obsolete and inapplicable.

56.    Defendants have not only made "substantial changes" to the proposed Nuclear Facility since the 2003 EIS that are relevant to environmental concerns (40 CFR 1502.9(c)(1)(i)), but there also exist "significant new circumstances [and] information relevant to environmental concerns and bearing on the proposed action or its impacts," which have manifested themselves since the antiquated 2003 EIS and 2004 ROD were issued.  40 CFR 1502.9(c)(1)(ii).

57.    As summarized in the Factual Background, defendants have been aware, since at least May 2009, of the substantial changes in the proposed federal action that are relevant to environmental concerns, the significant new circumstances relevant to environmental concerns, and the significant and expansive changes in "the scope of the proposed action...since the original EIS was prepared."   Defendants are also aware of the "importance, size, [and] complexity of the proposal," all which warrant preparation of a new EIS.   Thus, while a Supplemental EIS ("SEIS") can be implemented under circumstances of mild change to remedy the deficiencies of an "old" EIS, those circumstances are absent in the present situation.  (*see* CEQ, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," at 32).

58.    In May 2009, defendants reported to Congress about the need to examine new project alternatives, a major element of the EIS scoping process (40 CFR 1501.7).  *See* paragraph 39 *infra.*  Consequently, defendants' own acknowledgments underscore the need for a new EIS,

20

including the initial scoping process, to examine the environmental impacts of currently available alternatives to the expanded proposed Nuclear Facility (40 CFR 1501.7).

59.     These acknowledgments have been underscored by requests from the Senate Armed Services Committee for a complete review of the size and cost of the presently-proposed Nuclear Facility project.

60.     Moreover, according to Defendants' own policies implementing NEPA, the substantial and fundamental changes proposed for the new Nuclear Facility mandate an entirely new EIS, preceded by the required scoping process.  DOE has described the circumstances which warrant a new EIS and a new scoping process, as opposed to a SEIS, in the Preamble to DOE's NEPA regulations (April 24, 1992, at 57 FR 15122) and in its NEPA guidance (Revised "Frequently Asked Questions on the Department of Energy's (DOE's) National Environmental Policy Act (NEPA) Regulations," August 1998, at 10b).  As stated by DOE:

> As explained in the Preamble to the NEPA final rulemaking published on April 24, 1992 (57 FR 15122), DOE believes that there is no need to repeat the public scoping process if the scope of the proposed action has not changed since the original EIS was prepared. Such an approach is consistent with 40 CFR 1502.9, which does not require public scoping for a supplemental EIS. However, as stated in the Preamble, *when the scope of the proposed action has changed, or the importance, size, or complexity of the proposal warrant, DOE may elect to have a scoping process.* (emphasis added)

61.     It is incontrovertible that "the scope of the proposed action has ...changed since the original EIS was prepared" and that "the importance, size, or complexity of the proposal warrant" re-examination of the scope of the EIS, including re-examination of reasonable project alternatives.  However, defendants have never analyzed their substantially changed Nuclear Facility project, with its additional project elements and its greatly expanded environmental

21

impacts, in any EIS. As a result, defendants have been and are continuing to implement a novel Nuclear Facility project alternative which differs substantially from, and has significantly different environmental impacts than, any alternative analyzed in any EIS, including the 2003 CMRR EIS.

62.   Additionally, in contravention of the Administrative Procedure Act (5 U.S.C.A. §§ 701 *et. seq.*) as well as NEPA and its implementing regulations, defendants attempted to implement a different project alternative ("below-ground construction") than the one chosen and justified in the 2004 ROD ("above-ground construction"). Defendants chose to implement a project alternative not chosen and justified in any ROD, in violation of 40 CFR 1505.2.

63.   Moreover, defendants must publish a decision which selects an alternative "encompassed by the range of alternatives discussed in the relevant environmental documents and . . . described in the environmental impact statement" in a formal ROD (40 CFR 1502.2(e), 40 CFR 1505.1(e); 10 CFR 1021.210 (d); 40 CFR 1505.2). Contrary to these regulatory requirements, defendants ultimately chose to attempt to implement an alternative (construction to a depth of 125 feet) not included within the range of alternatives analyzed in the 2003 EIS, let alone one selected or even mentioned in the 2004 ROD.

64.   Accordingly, defendants' failure to prepare a new EIS with the required scoping process, including a re-examination of reasonable alternatives and followed by issuance of a new and accurate ROD, is arbitrary and capricious, and a violation of NEPA, the Administrative Procedure Act, and the CEQ and DOE regulations.

<u>Count II</u>

**Violation of NEPA – Failure to Develop EIS Addressing
Connected Actions and Cumulative Environmental Impacts.**

65.     Plaintiff incorporates the allegations in paragraphs 1 through 64 the same as if fully set forth.

66.     Under NEPA, federal actions may be single and unconnected, or they may be "connected," "cumulative," or "similar."   Connected actions are those which automatically trigger other actions which may require an EIS, cannot or will not proceed without other actions, or are interdependent parts of a larger action and depend on the larger action for their justification (40 CFR 1508.25(a)(1)).   "Cumulative actions" are those which, with other proposed action(s), have cumulatively significant impacts and should therefore be discussed in the same EIS (40 CFR 1508.25(a)(2)).

67.     In addition to the new subprojects within the proposed Nuclear Facility, defendants are now also pursuing several connected actions which are geographically proximate, functionally related, and/or roughly contemporaneous, or which have cumulative impacts.   These connected and cumulative actions include the following construction projects:

A.     The Nuclear Materials Safeguards and Security Upgrade Project (NMSSUP);

B.     The TA-55 Revitalization Project (TRP);

C.     The Radioactive Liquid Waste Treatment Facility (RLWTF);

D.     The TRU Waste Facility (TRU);

E.     Material Disposal Area C Closure;

F.     Material Disposal Area G Closure;

23

        G.     The Waste Disposition Project; and

        H.     RLUOB Occupancy.

68.    Defendants have characterized the projects referenced above as "major projects" which are "near-concurrent" parts of a coordinated "Pajarito Construction Corridor" project nexus. None of these eight, with the exception of RLUOB Occupancy, was analyzed in the 2003 EIS, or in the context of decisions regarding alternatives to the proposed Nuclear Facility.

69.    Defendants are also pursuing, now and in the coming decade, major new *programs* and *projects* involving plutonium, which are planned to take place in PF-4 and RLUOB at roughly the same time as the construction projects referenced in paragraph 67 above. These programs and projects are connected to the proposed Nuclear Facility and will have cumulative impacts that must be analyzed within an EIS (40 CFR1508.25(c)).

70.    Defendants have described the above programs and projects, including the proposed Nuclear Facility, as subprojects within a "Pajarito Construction Corridor." On other occasions defendants have described many of the same or similar projects, including the proposed Nuclear Facility, as subprojects within "Integrated Nuclear Planning." On yet other occasions defendants have described many of the same or similar projects as elements within a "Consolidated Plutonium Center" and a "Consolidated Nuclear Production Center." The close affinities of these projects underscore the necessity of including the impacts of all these proposed facilities as connected or cumulative actions within the "full and fair" environmental impacts analysis required by 40 CFR 1502.1.

71.    Defendants must analyze the full suite of impacts of the proposed Nuclear Facility and its necessary subprojects and elements, as well as the connected actions with which the

proposed Nuclear Facility is functionally interdependent.  Defendants' failure to do so is arbitrary and capricious and a violation of NEPA.  Consequently, defendants should be enjoined from proceeding in any manner with the proposed Nuclear Facility without conducting a *de novo* EIS preceded by an open scoping process, one purpose of which will be to delineate the connected actions and cumulative impacts meriting inclusion and analysis.

Count III

**Violation of NEPA- Failure to Provide Required<br>Mitigation Measures and Mitigation Action Plan.**

72.    Plaintiff incorporates the allegations in paragraphs 1 through 71 the same as if fully set forth.

73.    A central purpose of NEPA is to minimize and mitigate environmental impacts. The CEQ regulations formalize an obligation to study and specify appropriate mitigation measures in EISs. (40 CFR 1502.14 (f), 40 CFR 1502.16 (e) through (h)).  Mitigation may include: avoiding impacts by not taking an action or part of an action; minimizing impacts by limiting the action; rectifying impacts by repairing or restoring the environment; reducing impacts by taking protective actions; and compensating for impacts by providing substitute resources.  (40 CFR 1508.20).

74.    Once the project as a whole is considered to have significant effects, all of its specific effects on the environment (whether or not each is deemed "significant") must be considered, and mitigation measures must be developed where it is feasible to do so. Sections 1502.14(f), 1502.16(h), 1508.14. (CEQ, "Forty Questions," at 19a).   Crafting and committing to mitigation measures is one of most important means by which NEPA protects the environment

and citizens, including minority populations, low-income populations, and Indian tribes. (Executive Order 12898 on Environmental Justice, February 11, 1994).

75.     Moreover, the ROD itself must contain a concise identification of the mitigation measures which the agency has committed itself to adopt. The ROD must also state whether all practicable mitigation measures have been adopted, and if not, why not. (40 CFR 1505.2(c)). The ROD must identify the mitigation measures, monitoring, and enforcement programs that have been selected and plainly indicate that they are adopted and enforceable as part of the agency's decision.

76.     In addition to mitigation measures discussed and crafted in EISs, DOE's NEPA regulations require Mitigation Action Plans. The pertinent regulation provides:

> [f]ollowing completion of each EIS and its associated ROD, DOE shall prepare a Mitigation Action Plan that addresses mitigation commitments expressed in the ROD. The Mitigation Action Plan shall explain how the corresponding mitigation measures, designed to mitigate adverse environmental impacts associated with the course of action directed by the ROD, will be planned and implemented. (10 CFR 1021.331)

77.     Because defendants have no EIS which addresses the currently-proposed Nuclear Facility, or any applicable ROD, defendants necessarily have omitted mitigation measures and a mitigation plan for the impacts yet to be identified and analyzed by themselves or by commenters.   Additionally, defendants have no other specific and applicable mitigation measures, plans, or commitments in any other environmental document, including the SWEIS and CTSPEIS, or their associated RODs, or in any other EIS or ROD or subsequent to them.

78.     Defendants' 2003 EIS inexplicably claimed that their then-proposed project would have no impacts which would merit mitigation measures. According to defendants, based on the analyses of the environmental consequences resulting from the proposed action, no

mitigation measures would be necessary because all potential environmental impacts allegedly would be below acceptable levels of promulgated standards.

79.     Defendants' decision to forego a mitigation plan and identify mitigation measures was not related to, or based on, the current iteration of the Nuclear Facility. Defendants' failure to analyze and craft reasonable mitigation measures for the impacts of the proposed Nuclear Facility, to commit to those measures in an enforceable ROD, and to prepare a Mitigation Action Plan for the proposed Nuclear Facility prior to implementation, is arbitrary and capricious and a violation of NEPA and its implementing regulations. Accordingly, defendants should be enjoined from taking any further action with respect to the Nuclear Facility until such time as defendants comply with NEPA and prepare an EIS and issue a ROD with appropriate and enforceable mitigation measures, and prepare a Mitigation Action Plan pursuant to defendants' regulations.

<u>Count IV</u>

**Violation of NEPA – Failure to Integrate
NEPA–Required Analysis in Decision-Making Processes
for the Proposed Nuclear Facility.**

80.     Plaintiff incorporates by reference the allegations in paragraph 72 through 79 the same as if fully set forth.

81.     NEPA requires environmental analyses prior to agency decision-making. It does so for the purpose of influencing federal decisions. Consequently, agencies must "include in every recommendation or report on proposals for...major federal actions...a detailed [EIS]..." (42 U.S.C.A. § 4332(C)).

27

82.     The purpose of NEPA's implementing regulations is to foster "better decisions." This is the reason NEPA requires EISs and the reason these EISs must be prepared and available prior to federal decisions and actions (40 CFR 1500.1).  EISs assess "proposed agency actions, rather than justifying decisions already made." (40 CFR 1502.2(g)).

83.     The primary purpose of an EIS is to serve as an action-forcing device to ensure that the policies and goals defined in NEPA are infused into the ongoing programs and actions of the Federal Government.   Consequently, federal agencies are required to integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice, so that all such procedures run concurrently rather than consecutively. (40 CFR 1500.2)

84.     NEPA's implementing regulations also require EISs to be explicitly linked with management and cost analyses prior to agency decision-making.  Cost-benefit analyses and any related "important qualitative considerations" which are "relevant and important" to decisions must be indicated, included by reference, or appended to EISs. (40 CFR 1502.23).

85.     Defendants' decision-making regarding the nature and scope of the proposed Nuclear Facility, and defendants' choices significantly affecting expected environmental impacts and costs, did not stop with the 2004 ROD.   These processes continued, leading to project alternatives and impacts that lay far outside the range of choices and impacts discussed in the 2003 EIS, in violation of NEPA (40 CFR 1502.2(e), 40 CFR 1505.1(e); 10 CFR 1021.210 (d). Upon information and belief, the scope, scale, and impacts of the proposed Nuclear Facility are subjects of current decision-making, uninformed by a NEPA scoping process and without any applicable EIS.

86.     By May 2009, defendants admitted to Congress that the proposed Nuclear Facility planning assumptions had changed and that the new scope of any Nuclear Facility and any decision to proceed would be dependent on the outcome of a new Nuclear Posture Review (completed only in April 2010) and other strategic decision making.

87.     By September 2009, major design changes to the Nuclear Facility project had occurred, partly as a result of an independent review process formalized by the FY2010 Defense Authorization Act (Public Law 110-417).   According to defendants, these changes added approximately 225,000 additional cubic yards of excavation and an additional 225,000 cubic yards of concrete and/or grout.  This major decision was not preceded by any applicable EIS or integrated with NEPA analysis.

88.     New information available by May 2009 also included "significant" changes in seismic hazard and design requirements, as well as major new security requirements, both of which contributed to major design decisions which significantly escalated the costs and associated environmental impacts.  These decisions were not preceded by any applicable EIS or integrated with NEPA analysis.

89.     Moreover, defendants have prepared no applicable EIS, and are not integrating NEPA analysis with, the following decisions and plans, which have or are changing the Nuclear Facility proposal and its impacts:

A.     Defendants' ongoing study to keep CMR Wing 9 open indefinitely, the permanent closure of which was part of the proposed action in the 2003 EIS;

B.     Defendants' plans and interim actions to keep open parts of the CMR long past 2010, the closure of which was part of the proposed action in the 2003 EIS;

29

C.     Defendants' current plans to conduct further Nuclear Facility project reviews in the near future, which, upon information and belief, include review of alternative sizes of the facility as well as its basic requirements;

D.     Defendants' current studies of utilities, traffic impacts and road modifications, possible sites for ancillary facilities needed for the proposed project, institutional impacts, and other aspects of and alternatives to the proposed project; and

E.     Defendants' current plans for moving program activities out of CMR and into RLUOB and PF-4, without reliance on the proposed Nuclear Facility.

90.     It is now beyond dispute that the information in the 2003 EIS was not of "high quality" in critical areas (e.g. the nature and scope of the project, the seismic hazard, and the soils beneath the site), which have rendered its conclusions and environmental analysis obsolete for NEPA's purpose of informing federal decisionmakers.  (40 CFR 1500.1(b))  Defendants' continued failure to integrate NEPA with their decision-making processes is an arbitrary and capricious misuse of agency discretion.  Consequently, defendants should be enjoined from taking any further actions which may prejudice federal decisions to be made with respect to the proposed Nuclear Facility, pending the completion of a new EIS, preceded by the required scoping process and followed by issuance of a new ROD.

<u>Count V</u>

**Violation of NEPA – Denial of Review and Comment Opportunities.**

91.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 90 the same as if fully set forth.

92.     NEPA's notice and comment provisions are a fundamental aspect of NEPA's method of environmental protection.  Accordingly, "federal agencies shall to the fullest extent possible... (d) Encourage and facilitate public involvement in decisions which affect the quality of the human environment." (40 CFR 1500.2(d)).  EISs "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." (40 CFR 1502.1)

93.     To achieve meaningful comment and participation, NEPA's implementing regulations provide detailed requirements for agency, tribal, and public involvement.  Agencies shall "make diligent efforts to involve the public in preparing and implementing their NEPA procedures" (40 CFR 1506.6(a)), beginning with a notice of intent published in the Federal Register and proceeding to the scoping process (40 CFR 1501.7) and to the preparation of the EIS itself (40 CFR 1503.1).

94.     In contravention of these requirements, defendants have not provided any notice or comment process involving the public, relevant agencies, and tribes concerning the nature of the proposed Nuclear Facility being designed today, reasonable alternatives to it, or the likely impacts of the proposed new project and its alternatives.  Despite a period of six (6) years since the 2004 ROD, the public, agencies, and tribes have not been notified that today's proposed Nuclear Facility involves a much greater irreversible commitment of resources and is a far more impactful project than any alternative analyzed in the 2003 EIS, including the alternative chosen in the 2004 ROD.  The most recent comment period for this project closed in June 2003, more than seven years ago.  These procedural and informational violations gravely undermine the

independent scrutiny which is essential to implementing NEPA. They also harm citizens procedurally and informationally.

95. DOE's NEPA regulations authorize the production of Supplement Analyses (SAs) to discuss changed project parameters, circumstances, and impacts pertinent to deciding whether a supplemental EIS or a new EIS must be prepared pursuant to 40 CFR 1502.9(c). (10 CFR 1021.314(a)(1)). DOE must make the determination and the related SA available upon written request. (10 CFR 1021.314(c)(3)). Upon information and belief, defendants have prepared one or more SAs or other NEPA-related analyses, but despite, demand these analyses have not been made public or provided to plaintiff.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against defendants as follows:

A. Preliminarily and permanently enjoining all further investment in and contractual obligations for the Nuclear Facility, including but not limited to any portion of final design or construction of any project phase, portion or element, until defendants have completed a new EIS, including scoping, on the proposed Nuclear Facility and its alternatives in full compliance with NEPA and its implementing regulations;

B. Declaring that the defendants have violated the National Environmental Protection Act by:

1. failing to prepare an applicable EIS for the proposed Nuclear Facility, including failing to consider reasonable alternatives to the project overall, its design concept, and its construction strategy;

2.   failing to analyze connected and cumulative actions and cumulative impacts in any EIS pertaining to the proposed Nuclear Facility;

3.   failing to produce any mitigation plans or offer adequate mitigation measures with respect to environmental impacts of the proposed Nuclear Facility;

4.   failing to integrate NEPA analyses into the Agency's decision making process with respect to the proposed Nuclear Facility; and

5.   failing to provide notice and comment opportunities to plaintiff, citizens, and to the state of New Mexico, tribes, local governments, and other agencies, and failing to publicly release NEPA documents which defendants have prepared.

C.   Declaring that the defendants have violated the Administrative Procedure Act by attempting to implement a project alternative not chosen in any ROD.

D.   Requiring the defendants, through a mandatory injunction, to comply with all provisions of NEPA;

E.   Requiring the defendants, through a mandatory injunction, to prepare a new and applicable EIS for the proposed Nuclear Facility, beginning with the scoping process and following all provisions of NEPA and its implementing CEQ and DOE regulations;

F.   Awarding plaintiff costs of this action, including attorney's fees, expert witness fees, and other expenses, pursuant to the Equal Access to Justice Act, 28 U.S.C.A. § 2412; and

G.   Granting such other and further relief as the Court deems proper.

Respectfully submitted by:

*[Electronically Filed]*

HINKLE HENSLEY, SHANOR &
MARTIN, L.L.P.

/s/ Thomas M. Hnasko
Thomas M. Hnasko
Post Office Box 2068
Santa Fe, New Mexico 87504-2068
(505) 982-4554

LAW OFFICE OF DIANE ALBERT

Diane Albert
2108 Charlevoix St. N.W.
Albuquerque, NM 87104
(505) 842-1800

*Attorneys for The Los Alamos Study Group*

34